IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA,    )   CRIM. NO. 04-00197 HG
                      )
           Plaintiff,    )
      vs.                )
                      )
FRANCISCO OROZCO,         )
                      )
          Defendant.    )
_____ )

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**

This case involves the search and temporary seizure of two Federal Express packages and the search of a residence by law enforcement agents.  Search of the Federal Express packages revealed contraband in the form of money and illegal narcotics.

Defendant Francisco Orozco contends that the agents' actions violated the Fourth Amendment of the United States Constitution and moves to suppress the evidence obtained.  For the reasons set forth below, the Defendant's Motion to Suppress is DENIED.  The law enforcement agents had a reasonable articulable suspicion as a basis to temporarily seize both Federal Express packages and the duration of the seizures was not unreasonably long.  Defendant voluntarily consented to the search of one of the Federal Express packages and of the residence.  The agents searched the other Federal Express package pursuant to a valid

1

search warrant supported by probable cause.

## BACKGROUND AND PROCEDURAL HISTORY

On December 29, 2004, Defendant Francisco Orozco ("Defendant") was charged in a First Superceding Indictment with knowingly and intentionally conspiring to distribute and attempting to possess with intent to distribute certain quantities of methamphetamine and cocaine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), 841(b)(1)(B), 846 and Title 18, United States Code, Section 2.

On March 20, 2007, Defendant filed a Motion to Suppress. (Doc. 229.)

On March 29, 2007, the Government filed a Memorandum in Opposition to Motion to Suppress Evidence. (Doc. 231.)

On April 6, 2007, this matter came on for hearing.

## FINDINGS OF FACT

### A.    Temporary Seizure of FedEx Parcel #1

Sergeant Carlos Gomez ("Sergeant Gomez") of the Burbunk police department in California is a trained narcotics detective who since 2000 had been assigned to the L.A. IMPACT[1] task force.  The L.A. IMPACT task force is a narcotics interdiction team.  One of the team's activities is to regularly inspect parcels.  The team's experience has been that outbound parcels from California are more

---

[1]    "L.A. IMPACT" stands for "Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force."

likely to contain narcotics and inbound, money.

On January 14, 2003, at approximately 7:30 a.m. Sergeant Gomez was at the Federal Express ("FedEx") facility near the Los Angeles International Airport inspecting inbound parcels when he noticed a suspicious parcel. The parcel was a large brown box with a FedEx tracking number 837535955351 (hereinafter "FedEx Parcel #1"). (See Exh. 1 (air bill for FedEx Parcel #1).) Based on his training and experience, Sergeant Gomez believed the parcel to be a narcotics related package. Sergeant Gomez observed that the parcel had a handwritten air bill, was being sent priority overnight, the shipping charges were paid in cash, and the seams of the box were taped.

The air bill listed Defendant Francisco Orozco in Burbank, California as the recipient and Jubilee Logan in Hilo, Hawaii as the sender. The air bill also contained a contact telephone number for the recipient. Sergeant Gomez made calls to the telephone number. No one answered, but Sergeant Gomez left at least one message.

Because the parcel had been designated as priority overnight, by FedEx standards, it was scheduled to be delivered no later than 10:30 a.m. on January 14, 2003.

**B.    Search of FedEx Parcel #1 and of the Residence**

Before 10:30 a.m. Sergeant Gomez, along with three other members of the L.A. IMPACT team, and two other agents observing the

L.A. IMPACT team on that day, decided to take the FedEx parcel from the FedEx facility and deliver it to the address listed on the FedEx air bill. Upon taking the package, Sergeant Gomez left FedEx a receipt. (Exh. 6.) The residence was approximately 15 minutes from the FedEx facility.

Sergeant Gomez and the other agents were dressed in plainclothes and had their firearms concealed. Only two agents, Sergeant Gomez and Special Agent Eric Linch ("Agent Linch"), went to the front door and knocked on it. The other members of the team waited outside the residence, at the bottom of a stairwell, and outside of Defendant's view. A woman answered the door. Sergeant Gomez was carrying the parcel. Gomez identified himself verbally and showed his badge and identification card. Gomez asked if Defendant lived there or if he was there. The woman responded that Defendant was her son. Defendant's mother invited the officers inside the home. Defendant was in the home.

Sergeant Gomez identified himself to Defendant, both verbally and with his identification card. Gomez told Defendant he was not under arrest, but that Gomez wanted to talk to him about a parcel. Defendant said "fine".

Sergeant Gomez then proceeded to ask Defendant several questions about the parcel. Defendant acknowledged that he was expecting a parcel. Sergeant Gomez showed Defendant the parcel and Defendant acknowledged that the parcel Defendant was expecting was

the one Sergeant Gomez was carrying.  In response to Sergeant Gomez's questions, Defendant said that the parcel was from a friend and that it contained coffee.  In response to Agent Gomez's inquiry, Defendant agreed to allow the agents to look inside the parcel.

The agents opened the parcel and found that it contained a small red igloo ice chest with coffee inside.  There were six bags of coffee in their original packaging.  Gomez did not observe anything else inside the parcel.  Defendant explained that he and his family drank a lot of coffee.  After being in the home for approximately seven minutes, the agents left.

Outside the home, Gomez met up with the other team members who were waiting outside of Defendant's view.  Agent Gomez explained that they found an ice chest, containing coffee, inside the parcel. Detective John Cater was one of the other team members.  He had been waiting at the bottom of the stairs near the stairwell, and outside of Defendant's view, with the other team members while Sergeant Gomez and Detective Linch were inside the residence.

Detective Cater had worked in the field of narcotics interdiction for about twelve years.  Detective Cater found the circumstances suspicious based on the information he had about the parcel and his prior experience.  He wondered why anyone would pay $65 cash to ship coffee priority overnight inside an ice chest. Detective Cater had prior experience with drugs and money being

smuggled in ice chests.  He explained that the ice chest is made in two pieces.  It has an inner foam lining which is housed in an outer plastic lining.  The inner lining may be removed, and then the foam cut out to create space between the two linings. Contraband may then be hidden inside, and the lining replaced and spray insulation foam used to seal the two liners.

Because of his continued suspicion, Detective Cater went back to the residence with Special Agent Supervisor Frank Herbert ("Agent Herbert").  Detective Cater knocked on the door and Defendant answered.  Detective Cater identified himself and explained that he was with Sergeant Gomez.  He told Defendant that he understood that there was an ice chest and asked if he could take a look at it.  Defendant opened the door, invited Detective Cater in, and pointed to the ice chest.  The ice chest was on a dinette table.  Agent Herbert stepped inside the doorway and remained close to the door.

Once inside the residence, Detective Cater looked into the ice chest, saw the bags of coffee, and removed them.  He then picked up the ice chest and felt that it was extremely heavy for an empty ice chest.  He observed foam insulation protruding from some of the holes where the handles were.  Along the top he could also see where the protruding foam appeared to have been cut with a razor blade.

At that point, Detective Cater asked Defendant if he could

remove the liner.  Defendant said "sure".  Detective Cater placed
the ice chest on the ground, knelt down next to it, and used his
fingernails to pry the white lining up.  He then began to rip the
white lining out.  As Detective Cater was in the act of ripping the
lining out the cooler, Defendant blurted out that he needed to call
his lawyer.  Detective Cater explained that he was unable to cease
ripping out the lining of the cooler because Defendant's statement
was simultaneous with his action.  He described himself as "in
motion" like "a pitcher throwing a baseball".  The agents did not
prevent Defendant from calling a lawyer, and there is no evidence
that Defendant made any effort to do so.  Nor is there any evidence
that he otherwise refused to continue talking to the police.

Agent Herbert was standing near the front door while Detective
Cater removed the lining.  Immediately after Detective Cater
removed the lining and found the contraband, Agent Herbert motioned
toward Sergeant Gomez and the other team members, who were waiting
at the bottom of the stairs and outside of Defendant's view.  The
other agents came to the residence.  Defendant, his mother, Agent
Herbert, Detective Cater, Detective Linch, Sergeant Gomez, and the
two observing agents were then all inside the home.  Sergeant Gomez
testified that Defendant and his mother were free to move about the
residence, but that he kept them both in his view.

Detective Cater found approximately $14,000 inside the lining
of the ice chest.  When questioned about the money, Defendant said

it was his and that it was from his vitamin business.  Defendant explained that it was sent that way to avoid paying taxes.

Defendant gave the agents permission to search the residence. While Sergeant Gomez was talking with Defendant, the agents searched the residence.  During the search, the agents found a FedEx air bill.  The air bill listed Defendant as the sender and "Mat Rubio" in Hilo, Hawaii as the recipient.  (See Exh. 2.)  The agents found the air bill on a little table next to the couch, where Defendant had been sleeping and he had his belongings.

After searching the residence for approximately ten minutes, the agents advised Defendant that they were not arresting him, but that they were going to seize the money, the ice chest, and some other items, for further investigation.  The agents gave him a receipt for the items they took.  (Exh. 7.)

By that time, a canine narcotics unit had also arrived. Outside the residence, the canine alerted to the odor of narcotics on the money.

### C.   Temporary Seizure of FedEx Parcel #2

Special Agent Jesse Fourmy ("Agent Fourmy"), assigned to Hilo, Hawaii, an agent with the Drug Enforcement Agency ("DEA") for eleven years, testified about a second package with FedEx tracking number 837650547150 (hereinafter "FedEx Parcel #2").  On January 14, 2003, another officer in Hilo, Hawaii informed Agent Fourmy that a local confidential source provided information regarding a

FedEx parcel sent from California destined for Hilo, Hawaii that contained a shipment of drugs. The package was reportedly destined for Denise Mejia. That officer and Agent Fourmy interviewed the informant. The informant was the sole resident at 800 Kawiki Road, Hilo, Hawaii. (Exh. 5 at Affidavit of Jack Wright at ¶ 15.) The informant explained that Denise Mejia was expecting a shipment of drugs (in particular, approximately one kilogram of crystal methamphetamine (ice)) from California to Hilo, Hawaii in the next day or two, around the time of January 14. (Id.) The informant had been with Denise Mejia when she contacted her drug supply source via telephone and when she was packaging an estimated $20,000 to pay for the drugs. (Id.)

Independently, Agent Fourmy received information from another source, Stephanie Rosario, Denise Mejia's mother. Stephanie Rosario said that a package was going to be delivered to a Matt "Urubio" for Denise Mejia. Rosario had Matt Rubio's last name spelled incorrectly as "Urubio".

In addition to independently corroborating who the package was for, both informants said that the package was expected to contain crystal methamphetamine and/or cocaine. The information received by Agent Fourmy gave rise to a reasonable suspicion that a package containing narcotics was going to be arriving for Denise Meija through a Matt Rubio.

In addition to the information provided independently by each

9

informant, Agent Fourmy further received corroborating information from a Honolulu airport task force agent based on the information obtained by the L.A. IMPACT team in Burbank, California. The Honolulu agent told Agent Fourmy about the FedEx air bill found at the residence. The air bill was addressed to a "Mat Rubio" at 800 Kaiwiki Road in Hilo, Hawaii (the same address as for the first confidential informant) from Defendant in Burbank, California. (Exh. 2.) Agent Fourmy also received information about the money found in FedEx Parcel #1 at the same location where the L.A. IMPACT team found the air bill.

Based on the information received, Agent Fourmy began an investigation of FedEx Parcel #2. Agent Fourmy spoke with the FedEx manager in Hilo, Hawaii and told him that he was on the lookout for a package addressed to "Mat Rubio".

On January 14, 2003, at approximately 2:30 p.m., the Hilo FedEx manager notified Agent Fourmy that the parcel had arrived. Agent Fourmy asked the manager to put the parcel aside. Agent Fourmy arrived at FedEx at approximately 3:00 p.m. Upon arriving at the FedEx facility, Agent Fourmy looked at the FedEx shipping label and determined that the parcel set aside was the parcel he was looking for. (See Exh. 4 (FedEx shipping label for FedEx Parcel #2).)

After determining it was the correct parcel, Agent Fourmy signed the FedEx roster and recovered the parcel. Outside of the

FedEx facility, a dog from the canine narcotics team sniffed the package. The dog did not alert. Based on the knowledge that they had from the informants, the agents took the parcel back to the police station. Inside the police station, the canine handler conducted another sniff test and the dog alerted to the parcel.

### D. __Search of FedEx Parcel #2 Pursuant to Search Warrant__

On January 14, 2003 at approximately 9:50 p.m. a magistrate judge issued a search warrant for FedEx Parcel #2. (Exh. 5.) The agents executed the search warrant a little after 10:00 p.m. Inside the parcel, the agents found a number of items including two small plastic coolers, clothes, packing pellets, and shampoo. The agents separated the bottoms of the coolers. In one cooler the agents found crystal methamphetamine secreted in the bottom and, in the other, cocaine.

On January 15, 2003, the agents arranged to deliver the parcel without the drugs. The agents had also obtained a warrant to place a beeper inside the parcel. After the agents placed the beeper inside the parcel, it was delivered to 800 Kaiwiki at approximately 4:30 p.m.

According to FedEx's policy, FedEx Parcel #2 was supposed to be delivered to "Mat Rubio", by 5:00 p.m. on January 15, 2003, at the latest. The agents timely delivered the package.

## APPLICABLE LAW

### A.    Search and Seizure of Packages

Mail is protected by the Fourth Amendment of the United States Constitution from unreasonable search and seizure, but it is not beyond the reach of all inspection.  United States v. Hernandez, 313 F.3d 1206, 1210 (9th Cir. 2002).  "Rather, 'the question is whether the conditions for its detention and inspection have been satisfied.'"  Id. (quoting United States v. Van Leeuwen, 397 U.S. 249, 251, 252 (1970)).

A parcel is seized for Fourth Amendment purposes when there is "some meaningful interference with an individual's possessory interest in that property." United States v. England, 971 F.2d 419 (9th Cir. 1992).  The recipient's possessory interest is in the timely delivery of the package.  Hernandez, 313 F.3d at 1210.  A recipient of mail "has a reasonable expectation that the mail will not be detained by postal employees beyond the normal delivery date and time."  Id.  It follows that a package may be seized for a reasonable length of time for investigation.  Van Leeuwen, 397 U.S. at 252-53 ("No interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day when they were deposited").

### 1.    *Reasonable and articulable suspicion*

When a package is detained, the court first looks to whether the Government's interference with the owner's possessory interest

was reasonable within the meaning of the Fourth Amendment. See United States v. Place, 462 U.S. 696, 715 (1983); United States v. Jacobsen, 466 U.S. 109, 122 n. 20 (1984) ("[s]ome seizures can be justified by an articulable suspicion of criminal activity") (citing Place, 462 U.S. 696)).[2] For governmental interference to be reasonable, the initial detention[3] of the package must be based on a reasonable and articulable suspicion that it contains contraband or evidence of illegal activity. See United States v. Aldaz, 921 F.2d 227, 229 (9th Cir. 1990).

In determining whether a reasonable suspicion exists, the court looks to the "totality of the circumstances" to see whether the detaining officer had a "particularized objective basis" for suspecting legal wrongdoing. Hernandez, 313 F.3d at 1210. "A

---

[2] The United States Supreme Court decision in Place recognized the reasonableness of warrantless seizures of personal luggage, based on a reasonable and articulable suspicion that the luggage contained contraband or evidence of a crime, for the purposes of pursuing a limited course of investigation.

[3] Whether termed a temporary *seizure* or temporary *detention*, the key inquiry in package investigation cases is whether the government's interference with the package recipient's possessory interest in the package is reasonable under the circumstances -- *i.e.*, whether the agent had a reasonable and articulable suspicion to temporarily detain the package for further investigation of criminal activity and the detention was not unreasonably long. See England, 971 F.2d 419 (noting that the Ninth Circuit Court of Appeals bypassed the seizure question in its Aldaz, 921 F.2d 227, decision because "even if a seizure had occurred, we concluded that it was clearly justified by the postal inspector's *reasonable and articulable suspicion* that the packages contained narcotics") (emphasis added)).

reasonable suspicion is 'formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person [or object] detained is [involved] in criminal activity.'" United States v. Gill, 280 F.3d 923 (9th Cir. 2002) (quoting United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000)).   In determining reasonable suspicion, officers are allowed "to draw on their own experience and specialized training to make inferences and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

### 2.   *Length of detention or seizure*

Together with the reasonable suspicion requirement, because a package recipient has "a possessory interest in the timely delivery of the package", the court looks to whether the detention of the package was unreasonably long.  See Hernandez, 313 F.3d at 1210; id. at 1212 ("Even if the initial seizure of a mailed package is based on reasonable suspicion, a prolonged detention is unreasonable under the Fourth Amendment."). "When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause." Place, 462 U.S. at 703; see Hillison v. Jacobson, 733 F.2d 692 (9th Cir.

14

1984)("[P]robable cause is not needed to support a brief segregation and delay of the mailed package.").

## ANALYSIS

### A.    Temporary Seizure of FedEx Parcel #1

The agents had a reasonable articulable suspicion of criminal activity so as to justify their temporary seizure of FedEx Parcel #1 for further investigation. The Court first addresses the factors establishing a reasonable articulable suspicion of criminal activity before addressing whether the agents' act of removing the parcel from the FedEx facility and transporting it to the package recipient's address for delivery constituted an unlawful seizure.

#### 1.    *The Agents Had a Reasonable and Articulable Suspicion to Temporarily Seize FedEx Parcel #1*

In this case, the following factors support a reasonable and articulable suspicion of criminal activity: the shipping label was handwritten, the sender shipped the parcel priority overnight, the sender paid the parcel's shipping in cash, the package was sent from a known drug shipment hub (Hilo, Hawaii), and the seams of the box were taped. Sergeant Gomez testified that based on his experience, such characteristics give rise to a reasonable suspicion of criminal activity.

In Hernandez, the Ninth Circuit Court of Appeals found similar facts supported a reasonable suspicion to detain a package. Hernandez, 313 F.3d at 1211; See, e.g., United States v. Dennis, 115 F.3d 524, 532 (7th Cir. 1997) (suspicion was reasonable when

package was heavily taped; had been sent person-to-person; had been mailed from Los Angeles, a city known to be a source city for narcotics distribution; and had been mailed from a zip code different than the zip code listed in the return address); United States v. Lux, 905 F.2d 1379, 1381-82 (10th Cir. 1990) (finding reasonable suspicion where the package met three unspecified factors in the postal service's narcotics package profile); see also United States v. Johnson, 171 F.3d 601, 605 (8th Cir. 1999) ("[c]haracteristics consistent with innocent use of the mail can, when taken together, give rise to reasonable suspicion.").

It was not unreasonable for the agents to temporarily seize FedEx Parcel #1 under the reasonable suspicion that existed at the time.

### 2. *The Temporary Seizure of FedEx Parcel #1 Was Not Unreasonably Long*

Having determined that the initial seizure was supported by a reasonable and articulable suspicion of criminal activity, the Court examines other aspects of the temporary seizure for reasonableness. Certain circumstances may turn a valid initial seizure into an unreasonable one. For instance, even if the initial seizure of a parcel is valid, a prolonged detention is unreasonable under the Fourth Amendment. See Van Leeuwen, 397 U.S. at 252; see also Aldaz, 921 F.2d at 229.

In this case, the agents removed the package from the FedEx facility, gave FedEx a receipt for the package, and intended to,

16

and did, take the package to deliver it to the package recipient's address.   There was no unreasonable delay because the agents delivered the package before the normal delivery time.[4]   The Court finds that the agents did not violate the Fourth Amendment merely by seizing FedEx Parcel #1 for a short period of time based on a reasonable suspicion of criminal activity.

    **3.**    ***The Agents' Act of Transporting FedEx Parcel #1 to the Addressee's Residence For Further Investigation of Criminal Activity Was Reasonable Under the Fourth Amendment***

The Court next turns to the question of whether the agents' act of removing the parcel from the FedEx facility and delivering it to the residence constituted an unlawful seizure.   The parties dispute whether it was unconstitutional for the law enforcement agents to transport and deliver FedEx Parcel #1 based upon their reasonable articulable suspicion of criminal activity.   Defendant submits that the fact that the agents took possession of the package from FedEx and brought it to the residence, while acting as law enforcement agents, was such a "meaningful interference" with Defendant's possessory interest that it constituted an unlawful

---

    [4]   The Government, citing <u>Gill</u>, 280 F.3d at 931 (concurring opinion), argues that the test should be whether delivery of the mail is "significantly delayed".   <u>Compare</u> <u>see</u> <u>Hernandez</u>, 313 F.3d at 1212 (reiterating rejection of bright line rule and holding that court must determine whether delay in detaining package was *unreasonable* based on the facts of each case).   The Court does not need to reach the issue of whether "*significant* delay" is the proper standard because, in this case, the agents delivered both parcels within the normal delivery time.

seizure without probable cause.

While there is some case authority prohibiting the movement of a package temporarily detained based on reasonable suspicion, that is not the law in the Ninth Circuit. See State v. Ressler, 701 N.W.2d 915, 921 (N.D. 2005) (suppressing evidence on grounds that reasonable suspicion did not allow law enforcement to transport package from place where the suspicion arose to a wholly different venue such as the law enforcement center). There are a number of Ninth Circuit cases in which the court has found no Fourth Amendment violation where law enforcement transported a detained package for further investigation based on a reasonable articulable suspicion. In Aldaz, for instance, the Ninth Circuit Court of Appeals approved the re-routing of four parcels from a remote Alaskan village to Anchorage, Alaska for a dog-sniff test. Aldaz, 921 F.2d at 229. The Aldaz court concluded that the re-routing of the packages was justified based on the postal inspector's articulable suspicion that the packages contained narcotics.

Similarly, in England, 971 F.2d at 420, the court upheld the removal of packages from the post office to the police station to conduct dog-sniff tests. Id. ("[i]t is the extent of the interference with the defendant's possessory interest in his property, not the physical movement of the property, that determines whether a seizure has occurred.").

There are few cases on the precise issue before the Court in

18

this case -- *i.e.*, whether a law enforcement agent may lawfully transport a package, temporarily seized from a mail facility, to the addressee's residence in order to conduct further inquiry about the package.

The Government cites one case, <u>United States v. Lakoskey</u>, 462 F.3d 965 (8th Cir. 2006), presenting analogous circumstances. In <u>Lakoskey</u>, the postal inspector, a law enforcement agent, noticed a suspicious package. <u>Lakoskey</u>, 462 F.3d at 968. The postal inspector and three plain-clothed deputies from the Maricopa County Sheriff's Department removed the parcel from the ordinary mail delivery process to take it to the addressee's home for further investigation. Once at the defendant's door, the postal inspector asked him to sign for the parcel. <u>Id</u>. After the defendant signed the delivery receipt, the postal inspector showed the defendant his badge stating that he was with the postal inspector service and had some concerns about the parcel. <u>Id</u>. The defendant then took the parcel, said he was not going to tell what was inside, slammed the security door, and asked the officers to leave. <u>Id</u>. at 968-69. The postal inspector continued to talk to the defendant through the closed security door. <u>Id</u>. at 969. The defendant and postal inspector continued a verbal exchange and, at some point, the defendant agreed to open the package. In considering the defendant's Fourth Amendment challenge, the court did not address whether the mere act of removing the parcel from the mail facility

19

based on reasonable suspicion was permissible. Rather, it suppressed the parcel on the grounds that the defendant did not consent to the officers entry into his home. Id. at 974.[5]

Lakoskey suggests that the Court should focus on what actually transpired when the agents approached the defendant with the package, as opposed to the mere act of transporting the package from the mail facility to the defendant's address as listed on the package.

The Court has located an unpublished California state appellate court decision in which the court addressed circumstances similar to those present here. In People v. McCastle, 2002 WL 31608284 (Cal. App. 4th Dist., Nov. 21, 2002) (unpublished), cert. denied, Jan. 29, 2003, the court addressed an officer's detention of a parcel based on reasonable suspicion where the officer had removed the parcel from the mail facility, confronted defendant with it, and asked her if he could ask her some questions. In McCastle, the officer observed the defendant drop off a package at

_____

[5]  The Government contends that the Lakoskey court affirmed the district court's holding that the postal inspector had reasonable suspicion to detain the parcel. This is only partially accurate. The court's holding as to reasonable suspicion dealt with a parcel addressed to another defendant the day after the agents seized the first parcel. Id. at 977. The defendant's challenge to the seizure with respect to the parcel taken from the mail facility and brought to his residence focused on whether he consented to the officers seeing the contents of his mail and entering his home. The Court addresses the consent issue and the nature of the encounter between Sergeant Gomez and Defendant upon delivery of the parcel in the next section.

the mail facility.  While the defendant was still in the parking
lot, the officer observed the outside of the parcel, retrieved it
from inside the mail facility, and brought it to the defendant in
the parking lot.

The defendant contended that the officer's possession of her
FedEx package after she delivered it to the FedEx office was a
seizure in violation of her Fourth Amendment rights.  Id. at *2.
The court disagreed, finding the officer's inspection, detention,
and physical movement of the parcel reasonable.  Id. at *3.

The defendant in McCastle argued that the officer's actions
constituted an unlawful seizure under Bond v. United States, 529
U.S. 334 (2000).  In Bond, the Supreme Court held that it was a
violation of the Fourth Amendment for an officer boarding a bus at
an immigration checkpoint to squeeze and physically manipulate the
luggage of passengers placed in overhead bins.  In contrasting the
facts of the case before it with those in Bond, the McCastle court
observed: "the fact the officer took the package and held it in his
hand endowed him with nothing more than the ability to observe the
outside qualities of the parcel.  Until he received [defendant's]
consent to open the parcel, Officer Smith never tried to physically
manipulate the parcel in any way or make any type of physical
examination of the box."  McCastle, 2002 WL 31608284, at *3.  The
court noted that the defendant did not have any expectation of
privacy in the outside qualities of the parcel (based upon which

21

the officer formed his reasonable suspicion).  Id.

Under the facts of this case, the Court finds that the temporary seizure of FedEx Parcel #1, and the further investigation of criminal activity by transporting the package to the residence was not an unreasonable seizure under the Fourth Amendment. Similar to McCastle, the agents did not exceed the bounds of permissible conduct by temporarily seizing the package from the FedEx facility and moving it to a location where they could seek the defendant's consent to open the package.  The agents did not possess the package for a long period of time.  Indeed, they delivered the package to the address listed on the package earlier than required by FedEx.  There is no evidence that, had Defendant not consented to opening the package, the agents would have continued to detain the package rather than delivering it to Defendant.

As discussed above, the movement of the package for further investigation is clearly permissible under Ninth Circuit case law. The act of transporting the package to the residence to obtain Defendant's consent to search is analogous to transporting the package to the police office for a dog-sniff.  As highlighted by Lakoskey, the difference between the two scenarios lies in what occurs when the law enforcement agents arrive at the addressee's residence with the package.  This brings the Court to examination of the agents' encounter with Defendant upon arriving at the

22

residence.

**4.    *The Initial Encounter Between Defendant and the Agents Was Voluntary and Consensual***

"A consensual encounter with an officer is not a 'seizure of a person' that implicates Fourth Amendment protections." United States v. Matau, 191 F.Supp. 2d 1173, 1180 (D. Haw. 2002) (quoting United States v. Mendenhall, 446 U.S. 544, 555 (1980)). In United States v. Crapser, 472 F.3d 1141 (9th Cir. 2007), the Ninth Circuit Court of Appeals reiterated the standard for determining whether an initial encounter between an agent and a defendant constitutes a consensual encounter or a seizure implicating Fourth Amendment protections. In determining whether the initial conversation with a defendant is a consensual encounter versus a seizure, the court applies the well-established, general rule regarding "knock and talk" encounters:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. at 1146 (quoting Davis v. United States, 327 F.3d 301, 303-04 (9th Cir. 1964)). "An exchange is consensual if a reasonable person would feel free to walk away, decline to answer the officers' questions, or otherwise terminate the encounter." Matau, 191 F.Supp. 2d at 1180 (citing Mendenhall, 446 U.S. at 555)). The

23

government must prove the voluntariness of the consent by a preponderance of the evidence. <u>Matau</u>, 191 F.Supp. 2d at 1181 (citing <u>United States v. Matlock</u>, 415 U.S. 164, 177 (1974)).

The Court considers whether the circumstances under which the agents presented Defendant with the parcel somehow rendered the encounter between the Defendant and the agents coercive as opposed to consensual. The Court looks to "whether [the defendant] voluntarily opened the door or, alternatively, whether there were coercive circumstances that turned an ordinary consensual encounter into one requiring objective suspicion." <u>Crapser</u>, 472 F.3d at 1146 (quoting <u>United States v. Cormier</u>, 220 F.3d 1103 (9th Cir. 2000)).

Defendant did not elicit any testimony or present any other evidence to show that his encounter with the agents was non-consensual. There is no evidence of coercion. All of the agents were in plainclothes with their weapons concealed. The agents did not announce themselves as law enforcement in order to convince the Defendant to open the door. Both times, only two agents initially approached and obtained consent to enter the residence. The other agents remained outside of Defendant's and his mother's view. Both times the two agents entered the residence, the agents identified themselves, explained why they were there, and asked if they could talk to Defendant about the package. There is no evidence that the agents asserted any authority over the movements of Defendant or his mother or that they otherwise acted in an aggressive or

24

threatening manner.

It is necessary to examine whether the fact that the agents presented Defendant with the package changed the consensual nature of their encounter. The California state appellate court in McCastle squarely addressed this issue. The court considered whether the officer used the presence of the package to coerce defendant into consenting to a search of the package. McCastle, 2002 WL 31608284, at *5. The appellate court upheld the lower court's determination that the mere presence of the package did not transform the otherwise consensual encounter into a coercive one. Id. In so holding, the court considered the following facts: the officer asked permission to open the package which implied a choice whether or not to allow inspection of its contents; the officer did not do anything with the package other than hold it while he asked defendant for permission to look inside; the officer did not tell defendant he had authority to open the package or make any threat as to what would happen if she did not allow him to look inside the package. Id.

The Court also looks to analogous luggage search cases for guidance. The consent to search aspects of this case present circumstances similar to those in United States v. Va Lerie, 424 F.3d 694 (8th Cir. 2005) (en banc). Va Lerie was a bus station luggage search case in which the court considered whether Va Lerie voluntarily consented to search of his luggage. In Va Lerie the

25

Nebraska State Patrol ("NSP") temporarily removed Va Lerie's checked luggage from the luggage compartment, approached Va Lerie with his luggage, and asked him to consent to a search. The court first determined that the removal of Va Lerie's luggage from the luggage compartment to a room inside the bus terminal did not constitute a Fourth Amendment seizure. Id. at 709. Unlike this case, the Va Lerie court did not need to address the reasonableness of the officers temporary seizure of the luggage. Id. at 709 n. 10.

The court next considered whether Va Lerie voluntarily consented to the search of his luggage. The court considered a number of factors which it found showed voluntary consent. Id. at 709-10. Significantly, the court "gave little weight" to the fact that the officers presented Va Lerie's checked luggage to him when requesting permission to search "because this evidence does not transform the consensual encounter between the NSP and a bus passenger into a coercive encounter." Id. at 710. The court reasoned:

> Given our holding that the NSP was not constitutionally forbidden to remove the checked luggage from the bus to present the luggage to Va Lerie to seek consent to search, we would be hard-pressed to conclude such a presentation would be any different than simply asking Va Lerie for permission to search his luggage.

Id. at 710-11.

Similar to McCastle and Va Lerie, the mere fact that the

agents presented Defendant with the package (which they lawfully temporarily seized for further investigation) in this case, while seeking his consent to open it, did not transform the consensual encounter into a coercive one.  There is no evidence that the agents improperly used their temporary possession of the package to coerce Defendant's consent.  Nor did the agents tell Defendant that they had authority to open the package without his consent or otherwise make a threat as to what would happen if Defendant did not allow them to look inside the package.  Under these circumstances, the fact that the agents presented Defendant with the package while seeking his consent to search does not transform the otherwise consensual encounter into a coercive one.  The Court finds that the encounter between Defendant and the agents was voluntary and consensual.

### 5.  *Defendant Voluntarily Consented to the Search of FedEx Parcel #1 and the Residence*

"An individual may waive his Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of his person, property, or premises."  <u>United States v. Torres-Sanchez</u>, 83 F.3d 1123, 1130 (9th Cir. 1996).  The government bears the burden of proving that it obtained consent to search and that it was freely and voluntarily given.  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491 (1983).  The court considers the totality of the circumstances, including the following factors, in determining the voluntariness of a consensual search:

27

(1) whether the defendant was in custody;

(2) whether the arresting officers had their guns drawn;

(3) whether Miranda warnings were given;

(4) whether the defendant was notified that [he] had a right not to consent; and

(5) whether the defendant had been told a search warrant could be obtained."

Crapser, 472 F.3d at 1149 (quoting United States v. Jones, 286 F.3d 1146, 1152 (9th Cir. 2002)).  No one factor is dispositive and the fact that some of the factors are not established "does not automatically mean that consent was not voluntary." Torres-Sanchez, 83 F.3d at 1130.

The evidence shows that Defendant voluntarily consented to the search of FedEx Parcel #1 and of the residence.  The majority of the factors reiterated in Crapser militate in favor of a finding of voluntariness.  The unrefuted testimony is that Defendant and his mother consented to the agents entering the residence.  Indeed, Defendant does not expressly argue that the search of the residence was involuntary.  Rather, Defendant contends that the evidence obtained from the residence should be suppressed as "fruits of the poisonous tree".  (Motion at 11.)  Because the Court finds that the seizure of FedEx Parcel #1 was not illegal, Defendant's fruit of the poisonous tree argument fails.

As discussed above, the initial encounter was consensual. Defendant was not in custody and none of the agents had his gun

drawn at any time. Although the record does not show whether the agents affirmatively told Defendant he had a right not to consent, there is no evidence that the agents gave Defendant the impression that he had no choice but to allow the agents to open the package and search the residence. Police officers need not always inform citizens of their right to refuse when seeking to conduct a warrantless consent search. See United States v. Drayton, 536 U.S. 194, 206 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."). Nor is there any evidence that the agents otherwise engaged in coercive tactics. The agents did not tell Defendant that a search warrant could be obtained in order to convince him to consent to the search. Defendant was not given a Miranda warning, but, under the circumstances, one was not required. Defendant was not subject to a custodial interrogation. See United States v. Lopez-Chamu, 373 F.Supp. 2d 1014, 1017 (C.D. Cal. 2005) ("only if an interview by a government official constitutes a 'custodial interrogation' are Miranda warnings obligatory"); United States v. Perez-Lopez, 348 F.3d 839, 847 (9th Cir. 2003) (lack of Miranda warnings not determinative of whether consent to search was given voluntarily).

The testimony shows that Defendant asked Sergeant Gomez if he wanted to look in the package. The Defendant similarly consented

to Detective Cater's reexamination of the package, including the removal of the inner lining. While Defendant said he wanted to talk to a lawyer, this occurred while Detective Cater was already in the act of removing the inner lining. Consent to search may be withdrawn if "an intent to withdraw consent [is] made by unequivocal act or statement." <u>United States v. Sanders</u>, 424 F.3d 768, 774 (8th Cir. 2005). Revocation of consent must be made *prior* to the search. <u>See</u> <u>United States v. Jachimko</u>, 19 F.3d 296, 299 (7th Cir. 1994)("if Jachimko attempted to withdraw his consent after Hendrickson saw the marijuana plants, he could not withdraw his consent."). Defendant did not express his unequivocal intention to revoke his consent prior to the removal of the inner lining of the cooler. Moreover, there is no evidence that Defendant acted in a manner consistent with the revocation of consent. Defendant did not make any effort to contact a lawyer and did not cease talking to the agents. The agents did not prevent Defendant from using the telephone or otherwise say anything to coerce Defendant to continue talking.

In sum, the agents had a reasonable and articulable suspicion of criminal activity to temporarily seize FedEx Parcel #1 for further investigation. The temporary seizure of FedEx Parcel #1 was not unreasonably long. Nor was it unreasonable for the agents to transport FedEx Parcel #1 to the addressee's residence for further investigation of criminal activity. The initial encounter

between Defendant and the law enforcement agents was voluntary and consensual and Defendant voluntarily consented to the search of FedEx Parcel #1 and the residence.  The search and seizure of FedEx Parcel #1 did not violate the Fourth Amendment of the United States Constitution.

###    B.    Search and Seizure of FedEx Parcel #2

####        1.    *The Agents' Temporary Seizure of FedEx Parcel #2 for Further Investigation Was Not Unconstitutional Under the Fourth Amendment*

The Court next turns to consideration of the second FedEx parcel expected to arrive in Hilo, Hawaii on or about January 14, 2003.  Based largely on information provided by confidential informants, Agent Fourmy had developed a reasonable suspicion that the package contained contraband and had arranged to recover it from the Hilo FedEx facility.

Once Agent Fourmy recovered the package from the Hilo FedEx facility, a canine narcotics team conducted a dog-sniff test while the package was outside the FedEx facility.  The dog did not alert. Agent Fourmy then took the package back to the police station where an officer performed a second dog-sniff test and the dog alerted. The agents subsequently obtained warrants to search the package and to place a beeper inside prior to arranging a controlled delivery of the package.

The Defendant argues that once the dog failed to alert the first time outside the FedEx office the agents no longer had a

reasonable suspicion to detain the parcel.  Defendant acknowledges that in the ordinary case, once an officer has a reasonable suspicion that a package contains contraband or evidence of illegal activity he may detain the package for a reasonable time, until it can be subjected to a dog-sniff test, without there being an unlawful seizure.  (Motion at 12.)  The Defendant also acknowledges that a positive dog-sniff ripens an officer's reasonable suspicion into probable cause to believe that the package contains contraband.  (Id.)  The Government contends that the agents did not seize the Second FedEx parcel until after the positive dog-sniff, and after the agents searched it pursuant to the warrant and found drugs inside.  (Opp. at 14.)

The question before the Court is whether the agents were allowed to continue investigating the suspicious package by transporting it to the police station after the first dog-sniff test outside the FedEx station did not result in a positive alert.

The Court finds that the agents' conduct did not result in a Fourth Amendment violation.  First, agents are permitted to detain a package based on a reasonable suspicion in order to investigate suspected criminal activity so long as the detention of the package is not unreasonably long.  Investigation of a package may include transporting the package to a police station to conduct a dog-sniff test.  See Aldaz, 921 F.2d at 229;  England, 971 F.2d at 420.

Second, Defendant has not pointed to any case authority for

32

the proposition that a law enforcement officer's reasonable suspicion, and the ability to further investigate suspected criminal activity, terminates upon a negative dog-sniff test. To the contrary, a negative dog-sniff test does not dispell reasonable suspicion. See United States v. Lakoskey, 462 F.3d 965, 976-77 (8th Cir. 2006) (negative dog-sniff test did not dissipate reasonable suspicion); United States v. Ramirez, 342 F.3d 1210, 1212 (10th Cir. 2003) ("The factors giving rise to reasonable suspicion in the first place remain unchanged by the positive or negative results of the first sniff test."). If the law were otherwise, the investigation of criminal activity would be substantially hindered. Some packages involved in the illegal drug trade, such as those that contain money, do not necessarily result in positive-dog sniff tests. Yet, there may still be ample evidence to give rise to a reasonable suspicion that the package contains contraband. In this case, based upon the totality of the circumstances, the agents developed a reasonable suspicion of legal wrongdoing which did not terminate upon the negative dog-sniff test. It was not unconstitutional for the agents to subject the package to a second dog-sniff test.

Defendant's "fruit of the poisonous tree" argument with respect to the temporary detention of FedEx Parcel #2 likewise fails. The search and seizure of FedEx Parcel #1 was lawful. Even if it had not been, the agents had sufficient evidence to

establish a reasonable suspicion to detain FedEx Parcel #2 to further investigate suspected criminal activity without the evidence of the FedEx shipping receipt and the discovery of the cooler in California.   This same evidence helped to support the magistrate judge's finding of probable cause and is discussed below.

    **2.**   *The Agents Permissibly Searched FedEx Parcel #2 Pursuant to a Valid Search Warrant*

    **a.**   *Probable cause standard*

A magistrate judge's finding of probable cause should be given substantial deference.  United States v. Flores, 679 F.2d 173, 176 (9th Cir. 1982).   It should be upheld unless it is clearly erroneous.  United States v. McQuisten, 795 F.2d 858, 861 (9th Cir. 1986).  A reviewing court need only find that under the totality of the circumstances the magistrate judge had a substantial basis for concluding that probable cause existed.  Id.

Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the particular area to be searched.  United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995). There must be a reasonable nexus between the activities supporting probable cause and the location to be searched.  United States v. Valencia, 24 F.3d 1106, 1109 (9th Cir. 1994) (citing United States v. Taylor, 716 F.2d 701, 706 (9th Cir. 1983)); United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir. 1993) (citation omitted); United States v. Ocampo, 937 F.2d 485, 490 (9th Cir.

1991).  The affiant need not provide direct evidence that contraband or evidence is likely to be found in a particular location.  United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).  In doubtful cases, the court should give preference to the validity of the search warrant.  United States v. Johns, 948 F.2d 599, 602 (9th Cir. 1991).

**b.   *The search warrant for FedEx Parcel #2 was supported by probable cause***

The agents searched FedEx Parcel #2 pursuant to a search warrant. (Opp. at Exh. C ("Application and Affidavit for Search Warrant", hereinafter "Affidavit".)  Defendant argues that the evidence obtained from the search of FedEx Parcel #2 should be suppressed as "fruits of the poisonous tree" because, in obtaining the search warrant for FedEx Parcel #2, the agents relied on information obtained as a result of the allegedly unlawful search and seizure of FedEx Parcel #1, and that without this information the warrant is not supported by probable cause.  Defendant does not argue that the affidavit, as drafted (including the information obtained as a result of the search and seizure of FedEx Parcel #1), fails to establish probable cause.  Because the Court has found that the agents lawfully searched and seized FedEx Parcel #1 and lawfully searched the residence, this argument fails outright.

Defendant's argument also fails because the agents had sufficient information from independent sources to establish probable cause that FedEx Parcel #2 contained drugs or drug-related

contraband.    While  the  search  warrant  was  based,  in  part,  on
information  obtained  from  the  search  of  FedEx  Parcel  #1  and  the
search  of  the  residence,  the  search  warrant  was  also  based  on
detailed  information  from  two  confidential  informants,  the  positive
dog-sniff  test,  and  experienced  agents'  knowledge.

    The  first  confidential  informant  who  lived  at  800  Kaiwiki
Road,  told  the  DEA  that  Denise  Mejia  in  Hilo,  Hawaii  was  expecting
a  shipment  of  crystal  methamphetamine  on  or  about  January  13,  2003.
(Affidavit  at  ¶  15.)    The  second  confidential  informant  told  the
DEA  that  Denise  Mejia  was  expecting  a  package  to  be  delivered  to
"Matt  Urubio"  at  800  Kaiwiki  Road  in  Hilo,  Hawaii,  on  January  14,
2003.  (Affidavit  at  ¶  16.)  The  second  confidential  informant  also
predicted  that  the  package  would  be  coming  from  a  Francisco  Orozco
in  Los  Angeles.   Information  from  the  second  confidential  informant
corroborated  the  information  from  the  first  confidential  informant.

    In  sum,  the  agents  temporarily  seized  FedEx  Parcel  #2  based
upon  a  reasonable  suspicion  of  criminal  activity.   The  agents  did
not  violate  the  Fourth  Amendment  of  the  United  States  Constitution
by  subjecting  the  parcel  to  a  second  dog  sniff  test.   The  agents
searched  FedEx  Parcel  #2  pursuant  to  a  valid  search  warrant
supported  by  probable  cause.

### 3.  *The good faith exception applies*

    Finally,  even  if  evidence  obtained  from  the  search  and  seizure
of  FedEx  Parcel  #1  should  be  suppressed  and  the  affidavit  was

otherwise insufficient to establish probable cause, this case presents a textbook example of when the good faith exception to the exclusionary rule applies.  The good faith exception established in <u>United States v. Leon</u>, 468 U.S. 897 (1984) provides that evidence gathered as result of an invalid search warrant should not be suppressed if the officers would objectively have a good faith belief in the validity of the warrant.  <u>See</u> <u>United States v. Huggins</u>, 299 F.3d 1039, 1046-47 (9th Cir. 2002) (refusing to exclude evidence due to lack of probable cause in warrant).

Having examined the affidavit and search warrant, the Court finds that a reasonably well-trained officer, given the enumeration of facts amounting to probable cause, would not know that the search was illegal.

### CONCLUSION

Defendant's Motion to Suppress (Doc. 229) is **DENIED.**

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, June 6, 2007.



/S/ Helen Gillmor
_____
Helen Gillmor
Chief United States District Judge

_____
<u>United States v. Francisco Orozco</u>; Crim. No. 04-00197 HG; **ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS**